Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/11/2018 08:08 AM CDT

State of Nebraska, appellee, v.
Dominic L. Castellanos, appellant.
___ N.W.2d ___

Filed September 11, 2018.    Nos. A-17-808, A-17-809.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Warrantless Searches: Appeal and Error.** In reviewing a trial court's denial of a motion to suppress evidence obtained by a warrantless search under the emergency doctrine, an appellate court employs a two-part standard in which the first part of the analysis involves a review of the historical facts for clear error and a review de novo of the trial court's ultimate conclusion that exigent circumstances were present. Where the facts are largely undisputed, the ultimate question is an issue of law.

3. **Rules of Evidence: Other Acts.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably intertwined exception to the rule.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct

statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

6. **Jury Instructions: Appeal and Error.** It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.

7. \_\_\_\_: \_\_\_\_. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

8. **Search and Seizure: Warrantless Searches.** Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications.

9. **Search and Seizure: Warrantless Searches: Proof.** In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.

10. **Search and Seizure: Warrantless Searches: Police Officers and Sheriffs.** In the case of entry into a home, a police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry in the absence of exigent circumstances.

11. **Search and Seizure: Police Officers and Sheriffs: Words and Phrases.** The emergency doctrine is a category of exigent circumstances. The elements of the emergency doctrine are that (1) the police must have reasonable grounds to believe there is an immediate need for their assistance for the protection of life or property and (2) there must be some reasonable basis to associate the emergency with the area or place to be searched.

12. **Search and Seizure: Warrantless Searches.** The first element of the emergency doctrine considers whether there were reasonable grounds to find an emergency, and the second element considers the reasonableness of the scope of the search.

13. **Constitutional Law: Police Officers and Sheriffs.** An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances viewed, objectively, justify the action.

14. **Police Officers and Sheriffs: Probable Cause.** The presence of an emergency, like probable cause, hinges on the reasonable belief of the officers in light of specific facts and the inferences derived therefrom, not whether, in hindsight, one actually existed.

15. **Search and Seizure: Police Officers and Sheriffs: Probable Cause.**
    The first element of the emergency doctrine is similar to probable cause
    and asks whether the facts available to the officer at the moment of
    entry warranted a person of reasonable caution to believe that entry
    was appropriate.

16. **Search Warrants: Affidavits: Probable Cause.** Where an affidavit
    used for the purpose of obtaining a search warrant includes both ille-
    gally obtained facts as well as facts derived from independent and law-
    ful sources, a valid search warrant may issue if the lawfully obtained
    facts, considered by themselves, establish probable cause to issue the
    warrant; not all evidence obtained is considered fruit of the poisonous
    tree, and such evidence may be admitted if there is a sufficient indepen-
    dent basis for the discovery of the evidence.

17. **Rules of Evidence: Other Acts.** Neb. Evid. R. 404(2), Neb. Rev. Stat.
    § 27-404(2) (Reissue 2016), does not apply to evidence of a defendant's
    other crimes or bad acts if the evidence is inextricably intertwined with
    the charged crime.

18. ____: ____. Inextricably intertwined evidence includes evidence that
    forms part of the factual setting of the crime, or evidence that is so
    blended or connected to the charged crime that proof of the charged
    crime will necessarily require proof of the other crimes or bad acts, or if
    the other crimes or bad acts are necessary for the prosecution to present
    a coherent picture of the charged crime.

19. **Jury Instructions.** Whenever an applicable instruction may be taken
    from the Nebraska Jury Instructions, that instruction is the one which
    should usually be given to the jury in a criminal case.

20. **Jury Instructions: Appeal and Error.** All the jury instructions must
    be read together, and if, taken as a whole, they correctly state the law,
    are not misleading, and adequately cover the issues supported by the
    pleadings and the evidence, there is no prejudicial error necessitat-
    ing reversal.

Appeal from the District Court for Lancaster County: Jodi L.
Nelson and Darla S. Ideus, Judges. Affirmed.

Timothy S. Noerrlinger, of Naylor & Rappl Law Office,
P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss
for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Pirtle, Judge.

## INTRODUCTION

Dominic L. Castellanos appeals his convictions in the district court for Lancaster County for possession of a firearm by a prohibited person and possession of methamphetamine. He takes issue with the court's overruling his motion to suppress, allowing certain "[rule] 404 evidence" under the "'inextricably intertwined' exception," and failing to give his proposed jury instructions on possession. Based on the reasons that follow, we affirm.

## BACKGROUND

On April 29, 2016, an information was filed in the district court charging Castellanos with one count of possession of a firearm by a prohibited person, in violation of Neb. Rev. Stat. § 28-1206(1) and (3)(b) (Reissue 2016). On July 13, an information was filed in the district court charging Castellanos with one count of possession of a controlled substance, in violation of Neb. Rev. Stat. § 28-416(3) (Supp. 2015). The two cases were consolidated for trial and sentencing and have been consolidated for purposes of appeal.

On September 12, 2016, Castellanos filed a motion to suppress evidence in each case. A consolidated hearing was held on the motions. The evidence adduced at the suppression hearing was as follows:

On February 19, 2016, Officer Charity Hamm of the Lincoln Police Department was on an unrelated police call in the area of 17th and G Streets when she heard a single gunshot nearby. She testified that it sounded as if the gunshot came from an area southwest of her location. She got in her marked patrol car and headed toward the direction of the gunshot sound. When she got to the area of 16th and D Streets, she noticed a maroon sport utility vehicle parked oddly along the curb of D Street. As Officer Hamm approached the vehicle, she saw that there were three occupants in the vehicle and that the vehicle's passenger-side windows had both been shattered. There was

a circular impact on the passenger side of the vehicle, in between the two shattered windows, consistent with damage from a shotgun.

Officer Hamm, along with other police officers who had arrived at the scene, spoke with the three occupants in the vehicle. The occupants said that as they were driving on D Street, they observed a group of people gathered on the south side of the street. As they drove by the group of people, they heard a loud noise and felt the vehicle shake. The vehicle occupants reported that the group scattered after the gunshot, running toward a nearby house.

Officer Hamm started walking toward the house that the vehicle occupants had pointed to, and as she did, she went past an adjacent apartment building. She could see through the glass front door on the north side of the building; she observed a Hispanic male inside the building, standing in the hallway in front of an apartment unit, later determined to be apartment No. 2, and the door to apartment No. 2 was open. The male was holding some type of white towel or rag in his hands. She then observed another male come out of apartment No. 2, close the door behind him, and talk briefly with the Hispanic male. Officer Hamm tried to open the door to the apartment building, but it was locked. As she was trying to enter the building, both males ran in the opposite direction from her, toward another exit on the south side of the building. Officer Hamm ran around the building to chase after the two males and radioed for assistance from other officers.

Two police officers apprehended the two males almost immediately, locating them about a block away from the apartment building. The male with the white object in his hands was identified as Jeremy Cushing. The second male was identified as Castellanos. Officer Hamm subsequently identified the individuals as the same males she saw in the apartment building, outside apartment No. 2.

Officer Hamm and Lincoln police officer Richard Roh retraced the path Castellanos and Cushing had taken when

running from the apartment to the location where they were apprehended. In doing so, they found a white bathmat on the ground, which appeared to be the same white item Cushing was holding when Officer Hamm saw him in the apartment building. There was a dark red substance on the bathmat that looked like blood. The bathmat was wrapped around a Winchester .22 rifle. The rifle had a round jammed in the chamber, and the serial number was defaced, such that it was unreadable.

The officers also located a 20-gauge shotgun leaning against a fence on the west side of the apartment building. The shotgun had been shortened and had a spent casing in it. Both guns were located on the general path that Castellanos and Cushing would have taken as they ran from the apartment building.

Police officers entered the apartment building and located apartment No. 2. Officer Hamm, who was not one of the officers inside the apartment building, testified that she heard on the radio that the officers observed boot prints on the front door of apartment No. 2 and that there was damage to the doorframe, such that it appeared it had been kicked in at some point. In addition to that information, she was aware that there had been a shooting of the maroon sport utility vehicle and that two people had fled from apartment No. 2, one carrying a gun wrapped in a bathmat that had a red substance on it that looked like blood. Officer Hamm testified that based upon this information, the officers were concerned that there might be some sort of emergency in apartment No. 2, such that the life or health of others inside the apartment might be in jeopardy and they might need assistance. The officers made the decision to enter apartment No. 2.

Lincoln police officer Max Hubka was one of the officers who entered apartment No. 2. He testified that before entering apartment No. 2, he had been informed that a gun had been discharged, causing damage to a vehicle, that there was reason to believe someone may have been injured, and that there was preexisting damage to the door, which appeared to have been kicked or forced open. Officer Hubka also testified that before

going into apartment No. 2, he knew that Castellanos lived at the apartment, that he was a member of a gang, and that the gang was known to have weapons. Officer Hubka further testified that the police were working on another shooting at that time involving the same gang.

Officer Roh, who was with Officer Hamm and not inside the apartment building, testified that he believed there was an immediate need to enter apartment No. 2 based on the information the officers had at the time, which included that a vehicle had been shot; two individuals ran out of the apartment building, one carrying something white; and a rifle was found that was wrapped in a white bathmat with a substance on it that was possibly blood. Further, other officers in the hallway of the apartment building observed damage to the door to apartment No. 2, there were black marks on the door that looked like shoe marks, and it looked as if it had been kicked in. Roh testified the officers thought that there had possibly been a robbery and that someone could be injured inside apartment No. 2.

Sgt. Thomas Ward with the Lincoln Police Department testified that he made the decision to enter apartment No. 2 to make sure no one was injured inside. He testified that he made that decision based on the gunfire that struck a vehicle near the apartment building; the two males that ran out of the apartment building in the opposite direction of Officer Hamm, one of them carrying a white bathmat; the rifle, wrapped in a white bathmat, found when officers retraced the path of the two males; and the red substance on the bathmat that the officers thought could be blood. Sergeant Ward also testified that Cushing told one of the officers that when he arrived at Castellanos' apartment, the door had been kicked in, and that it appeared to the officers the door had in fact been kicked in.

Lincoln police officer Matthew Pulec was the officer that apprehended Cushing. Officer Pulec stated in his police report that after he apprehended Cushing, he asked him if he knew anything about the discharge of a firearm in the area. Cushing

did not indicate that he knew anything about the shooting, but told Officer Pulec that he had been at Castellanos' apartment only a short time before he saw Officer Hamm at the front entrance. He further stated that when he arrived at Castellanos' apartment, he observed the front door to have been kicked in and thought Castellanos might have been robbed.

When the police officers entered the apartment to check if anyone was injured or needed assistance, they did not find anyone inside the apartment. The officers observed several items of drug paraphernalia in plain view. Subsequently, Officer Hamm applied for and obtained a search warrant for apartment No. 2. When the search warrant was executed, a number of items were seized, including items of narcotics and ammunition for both guns that had been found.

Following the hearing, the trial court overruled Castellanos' motion to suppress, finding that the police were reasonably justified in their belief that an emergency might exist in apartment No. 2 such that immediate assistance might be needed to protect life. A jury trial was subsequently held, and Castellanos renewed his objections to evidence based on his motion to suppress.

After trial had started, the State discovered evidence that the Winchester .22 rifle had been stolen, which the State was not previously aware of, and it moved for a determination of whether such evidence would be deemed "rule 404" evidence. See Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016). The court held a hearing on the matter, and the following evidence was adduced:

Richard Lorance testified that he used to own a Winchester "Model 190" .22 rifle, which he kept in his bedroom closet in his house. He kept the rifle in a corner of the closet and had clothes on top of it. It was not secured in a gun safe, and the closet door did not lock. He also testified that his bedroom door had a lock on it, but that he did not keep it locked.

Lorance testified that between October 2015 and February 2016, his roommate would occasionally have visitors over to

the house, including Castellanos, who would typically come in the back door or through the roommate's bedroom window. Lorance testified that sometime around Christmas 2015, he discovered that his .22 rifle was missing. He told his roommate about it and then waited awhile to see if the rifle would get returned, but it was never returned. In February 2016, he contacted the police and reported it stolen.

Lorance testified that the serial number on the rifle was intact when he last had it and that he had the serial number stored on a document on his computer, which had since "crashed." He gave police permission to search his computer in an effort to retrieve the document containing the serial number. He was shown a document containing a list of serial numbers, passwords, and model numbers, including the serial number for a Winchester .22 rifle, and testified that it was the document he had stored on his computer before it quit working.

Lorance was also shown the Winchester .22 rifle found in this case, and he testified that it was the same make and model as the one he owned, but said that he was not entirely sure if it was his, because it was a very common rifle, the stock had been cut, there was tape around the end of the receiver, and the serial number had been removed. He recalled that his rifle had a "finicky" receiver and noticed that the one recovered in this case did as well.

For purposes of the rule 404 hearing, the State also introduced a laboratory report from Kent Weber, a forensic scientist with the Nebraska State Patrol crime laboratory. Weber's report indicated that the Winchester .22 rifle recovered in this case was examined by the crime laboratory, which included chemical processing of the defaced serial number, resulting in a full recovery of the serial number. It was determined that the rifle's serial number was the same as the one Lorance had owned and reported stolen.

The trial court found that the evidence regarding Lorance's stolen Winchester .22 rifle was inextricably intertwined with

Castellanos' charges and, therefore, was not excludable under rule 404 and was admissible.

The jury trial continued after the rule 404 evidence hearing. Officer Hamm was the primary officer to testify about the events leading up to Castellanos' arrest, and her testimony was consistent with the testimony she gave at the hearing on the motion to suppress. Lorance testified at trial, and his testimony was also consistent with the testimony he gave at the rule 404 hearing.

Weber testified about recovering the serial number on the .22 rifle, as well as other testing he performed on both guns recovered at the scene. He testified that the serial number was not visible when he received the rifle at the laboratory, but that by using a chemical reagent, he was able to read the serial number that had been defaced.

At the conclusion of the trial, the jury found Castellanos guilty of both charges. He was sentenced to 6 to 8 years' imprisonment for possession of a firearm by a prohibited person and 1 to 2 years' imprisonment for possession of methamphetamine. His sentences were ordered to run concurrently.

## ASSIGNMENTS OF ERROR

Castellanos assigns that the trial court erred in (1) overruling his motion to suppress, (2) admitting rule 404 evidence under the inextricably intertwined exception, and (3) failing to give his proposed jury instructions.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial

court's determination. *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018).

[2] In reviewing a trial court's denial of a motion to suppress evidence obtained by a warrantless search under the emergency doctrine, an appellate court employs a two-part standard in which the first part of the analysis involves a review of the historical facts for clear error and a review de novo of the trial court's ultimate conclusion that exigent circumstances were present. Where the facts are largely undisputed, the ultimate question is an issue of law. *State v. Salvador Rodriguez*, 296 Neb. 950, 898 N.W.2d 333 (2017).

[3,4] An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under rule 404(2), or under the inextricably intertwined exception to the rule. See *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[5-7] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *First Nat. Bank North Platte v. Cardenas*, 299 Neb. 497, 909 N.W.2d 79 (2018). It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given. *Id.* If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal. *Id.*

## ANALYSIS

*Motion to Suppress.*

Castellanos first assigns that the trial court erred in overruling his motion to suppress all evidence obtained from his apartment. He argues that the initial warrantless entry into his apartment was unlawful and that therefore, any evidence obtained during the subsequent search pursuant to the search warrant was inadmissible as fruit of the poisonous tree and should have been suppressed. The trial court found that the initial warrantless entry was justified under the "emergency doctrine" and that therefore, any evidence obtained as a result of the initial search or the subsequent search warrant was lawful.

[8,9] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications. *State v. Salvador Rodriguez, supra*. The State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *Id.*

[10] In the case of entry into a home, a police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry in the absence of exigent circumstances. *Id.*

[11] The emergency doctrine is a category of exigent circumstances. *State v. Salvador Rodriguez*, 296 Neb. 950, 898 N.W.2d 333 (2017). The elements of the emergency doctrine are that (1) the police must have reasonable grounds to believe there is an immediate need for their assistance for the protection of life or property and (2) there must be some reasonable basis to associate the emergency with the area or place to be searched. *Id.*

[12] The first element considers whether there were reasonable grounds to find an emergency, and the second element considers the reasonableness of the scope of the search. *Id.* Castellanos focuses primarily on the first element and argues that reasonable police officers would not have had

grounds under the facts of this case to believe there was an immediate need for their assistance for the protection of life or property.

[13-15] An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances viewed, objectively, justify the action. *State v. Salvador Rodriguez, supra.* The presence of an emergency, like probable cause, hinges on the reasonable belief of the officers in light of specific facts and the inferences derived therefrom, not whether, in hindsight, one actually existed. *Id.* The first element of the emergency doctrine is similar to probable cause and asks whether the facts available to the officer at the moment of entry warranted a person of reasonable caution to believe that entry was appropriate. *Id.*

In the present case, based on the totality of the circumstances, the police officers had a reasonable belief that there was an immediate need to enter Castellanos' apartment. The police were responding to a shooting that had just occurred in the immediate area, in which a vehicle was struck. After the occupants of the vehicle pointed in the direction people had scattered after the shooting, Officer Hamm saw two males inside a nearby apartment building. One of the males, Cushing, was holding what appeared to be a white towel or something similar, and the second male, Castellanos, had just come out of apartment No. 2. The two males ran when Officer Hamm tried to open the door to the building and went out an opposite exit of the building. The two men were quickly apprehended. When officers retraced Castellanos and Cushing's path, they found a white bathmat on the ground, which appeared to be the same white towel Officer Hamm saw Cushing holding when he was standing in the hallway outside apartment No. 2. The bathmat had a red substance on it that appeared to be blood, and there was a .22 rifle wrapped inside the bathmat. The officers also found a 20-gauge shotgun leaning against a fence outside the apartment building. The shotgun had a spent casing in the chamber.

The officers went inside the apartment building and located apartment No. 2, where Officer Hamm had seen Castellanos and Cushing. Prior to entering apartment No. 2, they saw boot or shoe marks on the door of the apartment and the door appeared to have been kicked in, because there was damage to the doorframe. The officers also knew prior to entering the apartment that Castellanos lived in the apartment and that he was a member of a gang. The officers were familiar with the gang, which was known to have weapons, and police were in the process of investigating another shooting involving the gang. Cushing had also told Officer Pulec when he was apprehended that when he arrived at Castellanos' apartment that night, he saw that the door had been kicked in and thought Castellanos might have been robbed. The officers then entered the apartment for the sole purpose of making sure there was no one in the apartment in need of assistance. Once inside, they remained there only long enough to determine whether there was anyone inside the apartment.

In our de novo review, we agree with the trial court that based on facts known to the officers before entering the apartment, they had reasonable grounds to believe there was an immediate need for their assistance for the protection of life or property. We also conclude that the officers had a reasonable basis to associate the emergency with apartment No. 2. Accordingly, the initial warrantless entry was justified under the emergency doctrine, and therefore, any evidence obtained as a result of the initial search or the subsequent search warrant was lawful. The trial court did not err in overruling Castellanos' motion to suppress.

[16] Further, even if we were to conclude the initial entry into the apartment did not satisfy the elements of the emergency doctrine, the evidence obtained pursuant to the search warrant still would have been admissible. The affidavit seeking the search warrant contained information independent from the facts derived from the initial short sweep of the apartment; such independent facts included the officer's detailed

summation of the entire incident, from hearing the gunshot to apprehending Castellanos and Cushing, as well as the discovery of the guns and white bathmat nearby. And although the search warrant sought authorization to seize controlled substances and related items, it also sought firearms, ammunition, loading devices, magazines, and other firearm paraphernalia—all of which were independently supported by the facts leading up to the discovery of the two guns found nearby. See *State v. Guilbeault*, 214 Neb. 904, 336 N.W.2d 593 (1983) (where affidavit used for purpose of obtaining search warrant includes both illegally obtained facts as well as facts derived from independent and lawful sources, valid search warrant may issue if lawfully obtained facts, considered by themselves, establish probable cause to issue warrant; not all evidence obtained is considered fruit of poisonous tree, and such evidence may be admitted if there is sufficient independent basis for discovery of evidence).

*Rule 404 Evidence.*

Castellanos next assigns that the trial court erred by admitting Lorance's testimony about his missing .22 rifle. He contends that this evidence was inadmissible under rule 404, and not subject to the inextricably intertwined exception.

Rule 404(2) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

[17,18] It should be noted that rule 404(2)'s list of permissible purposes is not exhaustive. Nonetheless, under our decisional law, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). Inextricably intertwined evidence

includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id.*

Castellanos argues that Lorance's testimony does not provide information that would form the factual setting for either possession of a controlled substance or possession of a firearm by a prohibited person. We disagree. Lorance's testimony about his missing .22 rifle was connected to the charge of possession of a firearm by a prohibited person. The parties stipulated at trial that Castellanos was a prohibited person on the date in question, so the only issue the State had to prove was whether Castellanos possessed either the shotgun or the .22 rifle. Lorance testified that his .22 rifle was missing and presumably stolen less than 2 months before the incident that led to the charges against Castellanos. Castellanos was at Lorance's house on multiple occasions during the timeframe that the gun went missing and would have had access to the rifle, because it was kept in Lorance's unlocked bedroom closet.

Further, the evidence at the rule 404 hearing and at trial showed that the .22 rifle recovered by the officers had the same serial number as the one owned by Lorance, confirming that the gun recovered was Lorance's gun. Lorance had a document on his computer which contained the serial number for his .22 rifle, and the document was recovered by the police department. Weber, the forensic analyst at the State Patrol crime laboratory, used a chemical process to reveal the defaced serial number on the rifle recovered by the officers. The two serial numbers matched. We conclude that Lorance's testimony was inextricably intertwined with the charge of possession of a firearm by a prohibited person and that therefore, rule 404(2) did not apply. The trial court did not err in admitting Lorance's testimony about his missing .22 rifle at trial.

Even if we were to conclude that Lorance's testimony was not inextricably intertwined with the possession of a firearm by a prohibited person charge and should not have been admitted, it would nevertheless be harmless error. There was additional evidence linking Castellanos to the guns, specifically, the ammunition that was found in his apartment. Numerous rounds of .22-caliber and 20-gauge ammunition were found inside a closet, along with other items that belonged to Castellanos, including an identification card, a credit card, and a W-2 form. The ammunition in the closet was the same brand and had the same characteristics as the ammunition in the two guns found outside the apartment building.

*Proposed Jury Instructions.*

Finally, Castellanos assigns that the trial court erred in failing to give two jury instructions he proposed regarding the meaning of "possession." The first instruction stated: "The Defendant's mere presence in an area where items were ultimately discovered is not enough to establish that the defendant was in 'possession' of said items." The second instruction stated: "Assuming an item is not found on the defendant's person, the defendant's proximity to the item, standing alone, is insufficient to prove 'possession.'"

Castellanos argues that his proposed instructions were correct statements of the law and that because the State's theory of the case rested on constructive possession, the evidence supported the instructions. He also claims that he was prejudiced by the court's refusal to give his proposed instructions, because there is a substantial likelihood the jury's verdict would have been different if his instructions had been given.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Parnell*, 294 Neb. 551,

883 N.W.2d 652 (2016), *cert. denied* ___ U.S. ___, 137 S. Ct. 1212, 197 L. Ed. 2d 254 (2017).

The trial court instructed the jury on the material elements of both charges and instructed the jury that the word "possession" means "either knowingly having it on one's person or knowing of the object's presence and having control over the object." It also instructed the jury that the word "knowingly" means "willfully or purposely."

[19,20] The definition of the word "possession" given by the trial court was based on NJI2d Crim. 4.2, which reads, "'Possession' of [the object] means either knowingly having it on one's person or knowing of the object's presence and having control over the object." Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case. *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). Further, all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012). Castellanos does not argue that the jury instructions given were given in error. He contends only that his proposed instructions also should have been given.

When the instructions are considered together, it is clear that the district court properly instructed the jury on the definition of the word "possession," and the trial court did not err in refusing to give Castellanos' proposed jury instructions.

## CONCLUSION

We conclude that the trial court did not err in overruling Castellanos' motion to suppress, admitting evidence under the inextricably intertwined exception to rule 404, and failing to give his proposed jury instructions. Accordingly, Castellanos' convictions and sentences are affirmed.

Affirmed.