IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. AGUILAR

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ANTHONY J. AGUILAR, APPELLANT.

Filed May 21, 2024.    No. A-23-389.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed.

W. Randall Paragas, of Paragas Law Offices, for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

### INTRODUCTION

Anthony J. Aguilar appeals from his conviction in the district court for Sarpy County of manufacturing a controlled substance (marijuana), possession of a firearm while in violation of Neb. Rev. Stat. § 28-416(1) (Reissue 2016), and possession of marijuana (more than a pound). On appeal, he assigns error to the court's denial of his motion to suppress. We affirm.

### STATEMENT OF FACTS

On January 21, 2022, the State filed an information in the district court, charging Aguilar with manufacturing a controlled substance (marijuana) in violation of § 28-416(1), a Class IIA felony; possession of a firearm while in violation of § 28-416(1), in violation of § 28-416(16), a Class III felony; possession of marijuana (more than a pound), in violation of § 28-416(12), a Class

- 1 -

IV felony; and negligent child abuse, in violation of Neb. Rev. Stat. § 28-707 (Cum. Supp. 2022), a Class I misdemeanor.

On May 16, 2023, Aguilar filed a motion to suppress, seeking to exclude all evidence obtained during a search of his residence on December 13, 2021. His motion outlines that police were called to the residence in reference to a parking violation; that they entered the residence "ostensibly to check on [Aguilar];" that police observed growing marijuana plants, a gun and ammunition, and other evidentiary items inside the residence; and that police then obtained a search warrant "predicated upon information gained from the . . . unconstitutional searches and seizures."

A suppression hearing was held before the district court on January 19, 2023. The court heard testimony from the police officers who checked Aguilar's residence prior to the search warrant, and received the officers' body camera footage, as well as an exhibit containing the search warrant, supporting affidavit, and inventory of items seized pursuant to the warrant, into evidence.

Officer John Lowery with the Bellevue Police Department testified that he was dispatched on December 13, 2021, to an address in Bellevue, Nebraska, in response to a complaint that a vehicle in the street was blocking the path of a garbage truck. Upon arriving at the address, Lowery saw a pickup truck with its front axle on "the apron of the driveway" leading up to the residence. The rest of the pickup was "out in the roadway," and a ladder on a rack on top of the pickup extended approximately 6 to 8 feet past the rear of the pickup. Lowery testified that the manner in which the pickup was parked was a safety hazard to other drivers.

Lowery "ran the plate" and found that Aguilar was the owner of the pickup, which was registered at a different address (a location in Omaha, Nebraska). When Lowery inspected the pickup, he saw that it was unlocked and the keys were in the ignition. Lowery initially thought maybe "somebody was doing work at the house or something." He went up to the house, knocked on the "screen door," and rang the doorbell several times, but no one answered. He walked around the outside of the house but did not find anyone. Lowery then spoke with a neighbor who was outside, who confirmed that the pickup "belonged at that residence" where it was parked and that it had been parked in that manner "for at least a day."

Lowery returned to the front door of the residence, knocked on the screen door and rang the doorbell again, and still received no answer. When he "looked in," he could see work boots and children's shoes at the bottom of "the stairs that led upstairs to the house." He then opened the screen door "to bang on the other door and it opened." Lowery clarified that he could not see daylight through the inner door, but that it opened when he knocked because it was not securely "latched." He testified that he "normally knocked" and did not "knock hard with the intention[] of opening the door." At that point, Lowery became concerned that someone inside the house might be injured or need assistance or that the house had been burglarized. Lowery called for a second unit, advising that he had "an open door," and Sergeant John McDaniel responded to the call. Lowery testified that calling for a second unit is the Bellevue Police Department's standard operating procedure before "clear[ing] an unsecured building." He waited to enter the residence until McDaniel arrived for reasons of officer safety. Lowery did not recall how long it took McDaniel to arrive; McDaniel testified that he arrived "[p]robably less than ten or 15 minutes" after receiving Lowery's call.

When McDaniel arrived, Lowery explained the situation. The officers then decided to "clear the house, make sure nobody's hurt." Lowery testified that, at the doorway, McDaniel yelled "Bellevue Police" several times. After receiving no answer, the officers entered the house and began to look in places "where people would be" to make sure that nobody was inside and injured.

Upon entering, the officers could smell "moderate odor of marijuana." The officers had noticed the aroma outside of the house, but because of the breeze, they were unable to pinpoint where the odor was coming from until they stepped inside. While checking inside the residence, the officers observed a "large brick" of marijuana and drug paraphernalia in plain view in the master bathroom. After they checked the "main floor and the upstairs," McDaniel again announced, "Bellevue Police," and the officers checked the basement. In the basement, the officers saw an "AR-15-style rifle," also in plain view. According to Lowery, the officers also observed in the basement a very large cloth-sided box with zippers on the sides. Lowery unzipped the box to make sure there was no one inside. Upon doing so, he observed between 8 and 15 marijuana plants, approximately 3 feet high, growing in the box. The officers returned to the main floor of the house, and Lowery testified that he "took a quick peek" into the garage, where a dog was barking. Lowery testified that when he briefly opened the door of the garage, he did not notice anything that caused him concern for someone's wellbeing.

The officers exited the house and contacted the special investigations unit to obtain a warrant to search Aguilar's house. The affidavit for the warrant was based on Lowery's and McDaniel's observations of the odor of raw marijuana, marijuana plants, equipment used to grow marijuana, and a firearm in plain view. The officers secured the house while they waited for the search warrant, which Lowery testified took "about a couple of hours" to arrive. Lowery did not partake in the search of the house pursuant to the warrant because he is allergic to marijuana, but he testified that the officers who conducted the search found additional items.

McDaniel's testimony at the suppression hearing was consistent with Lowery's. McDaniel confirmed the general policy, with some exceptions, that officers are not supposed to go into an unsecured location by themselves. McDaniel was asked about why he and Lowery entered the residence when they did, and he explained that based on the "totality of the circumstances, the information that [Lowery] had provided to [him] and that [McDaniel] had observed [himself]," he felt that "there was exigent circumstances under the emergency aid doctrine of the Fourth Amendment, that there possibly could be somebody injured inside the residence and/or somebody could have had a medical emergency." As to his own observations upon arrival and before entering the house, McDaniel observed open cabinets and drawers when walking around the back of the house and, from the front door, he observed shoes that appeared to be knocked over in front of the stairwell leading up. McDaniel testified that he "made the call" to enter, they announced their presence numerous times in both English and Spanish, they did not receive a response, after which they proceeded to clear the residence looking for anyone inside who needed aid. He explained that "to clear the house" meant engaging in "a methodical search anywhere that a person . . . a body could be," checking areas including closets. He described the odor of marijuana when they entered the residence as "overbearing."

On cross-examination, McDaniel testified that he made the call to enter the residence without a warrant "[u]nder the emergency aid clause exception to the Fourth Amendment." He explained his concern that "there might have been somebody injured or who had had a . . . medical

- 3 -

emergency and needed aid." He testified that he determined someone might be in need of emergency aid and made the decision to enter without a warrant "[b]ased upon the initial call, the pickup being left out in the middle of the roadway with . . . a full set of keys left in the ignition," the information relayed to Lowery by neighbors that the pickup belonged to that house, as well as the dogs barking inside the residence, the observations by him and Lowery of open drawers and cupboards, the shoe placement at the base of the stairs, and the front door "being ajar."

Aguilar did not call any witnesses at the suppression hearing, and after hearing arguments from the parties' attorneys, the district court took the matter under advisement.

On February 10, 2023, the district court entered an order, denying Aguilar's motion to suppress. After outlining the evidence from the hearing and relevant Nebraska case law, the court noted Aguilar's argument that there was no probable cause or reasonable suspicion for police to enter his residence without a warrant and that police used the fruits of that unconstitutional search and seizure to obtain a search warrant, which was unconstitutionally executed at his residence. The court then stated:

> It is undisputed that when law enforcement initially entered the residence at [Aguilar's address], they did not have a warrant. However, law enforcement was initially called to the area due to [Aguilar's] pickup blocking the street, and law enforcement initially approached the residence to inquire why the vehicle was parked in that manner. When nobody responded, however, coupled with the unsecured front door and keys left in the vehicle's ignition, the [c]ourt finds that law enforcement did have probable cause to believe that somebody was in need of assistance. While investigating this reasonable possibility, law enforcement observed weapons and drugs that allowed them to apply for and receive a search warrant. The search and seizure was then conducted pursuant to the valid warrant. Accordingly, based on the aforementioned discussion, the [c]ourt finds that law enforcement had probable cause to enter [Aguilar's] residence initially to check on his and/or any other occupants' well-being. Further, once law enforcement observed weapons and drug contraband contained therein, they obtained a search warrant and legally searched the premises.

Accordingly, the court denied Aguilar's motion to suppress in its entirety.

A bench trial on stipulated facts was held on April 4, 2023. In addition to receiving the parties' stipulated facts, the district court received the police reports from the search of Aguilar's residence and his arrest in December 2021, and took judicial notice of the motion to suppress proceeding and the exhibits that were received at that hearing. Aguilar renewed his motion to suppress, which the court again denied. The court granted the State's motion to dismiss the negligent child abuse count of the information. The court then found Aguilar guilty of the remaining three counts, ordered a presentence investigation, and scheduled sentencing.

Following a sentencing hearing on May 15, 2023, the district court entered an order of probation. The court sentenced Aguilar to concurrent terms of 5 years' probation on each count.

## ASSIGNMENT OF ERROR

Aguilar asserts, restated, that the district court erred in denying his motion to suppress.

STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Simons*, 315 Neb. 415, 996 N.W.2d 607 (2023). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

In reviewing a trial court's denial of a motion to suppress evidence obtained by a warrantless search under the emergency doctrine, an appellate court employs a two-part standard in which the first part of the analysis involves a review of the historical facts for clear error and a review de novo of the trial court's ultimate conclusion that exigent circumstances were present. *State v. Castellanos*, 26 Neb. App. 310, 918 N.W.2d 345 (2018). Where the facts are largely undisputed, the ultimate question is an issue of law. *Id.*

ANALYSIS

*Exigent Circumstances.*

Aguilar asserts that the district court erred in denying his motion to suppress. Aguilar argues that the exigent circumstances necessary for a nonconsensual, warrantless search of a home were not present in this case. Aguilar also argues that the officers failed to complete the purpose of entering the house under the emergency doctrine. Aguilar's motion to suppress was properly denied, as exigent circumstances justified the warrantless search of his house. Additionally, any such failure of police to complete their search would not grant him the relief he is seeking.

While searches and seizures conducted pursuant to a warrant supported by probable cause are generally considered reasonable, warrantless searches are considered per se unreasonable, subject to only a few specific exceptions that must be strictly confined by their justifications. *State v. Simons, supra*. The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *State v. Hammond*, 315 Neb. 362, 996 N.W.2d 270 (2023). It is the State's burden to show that a search falls within an exception to the warrant requirement. *Id.*

In the case of entry into a home, a police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry in the absence of exigent circumstances. *State v. Castellanos, supra*. The emergency doctrine is a category of exigent circumstances. *Id.* The elements of the emergency doctrine are that (1) the police must have reasonable grounds to believe there is an immediate need for their assistance for the protection of life or property and (2) there must be some reasonable basis to associate the emergency with the area or place to be searched. *Id.* The first element of the emergency doctrine considers whether there were reasonable grounds to find an emergency, and the second element considers the reasonableness of the scope of the search. *Id.* With respect to the first element, Aguilar argues that reasonable police officers would not have had grounds under the facts of this case to believe there was an immediate need for their assistance for the protection of life or property. As to the scope

of the search, he argues that the officers did not search enough of his residence, focusing on their failure to search the garage.

An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances viewed, objectively, justify the action. *Id.* The presence of an emergency, like probable cause, hinges on the reasonable belief of the officers in light of specific facts and the inferences derived therefrom, not whether, in hindsight, one actually existed. *Id.* The first element of the emergency doctrine is similar to probable cause and asks whether the facts available to the officer at the moment of entry warranted a person of reasonable caution to believe that entry was appropriate. *Id.*

In the present case, based on the totality of the circumstances, the police officers had a reasonable belief that there was an immediate need to enter Aguilar's residence to render emergency assistance. Lowery responded to a call about a vehicle parked so that it partially obstructed the roadway. The vehicle was unlocked, and a full set of keys was in the ignition. Neighbors told him that the vehicle had been parked in that way for at least 24 hours. Lowery received no answer when he knocked on the screen door and rang the doorbell several times. He could hear a dog barking inside and when checking the perimeter of the house, observed a drawer left open in the kitchen and shoes at the bottom of the stairs. When he knocked on the interior door of the house, the door opened as it was not securely latched. McDaniel made similar observations upon his arrival.

Aguilar argues that the officers did not have reasonable grounds to believe there was an immediate need for their assistance since Lowery called for a second officer and waited for his arrival before entering the residence. He notes the record shows that the search warrant in this case, once requested, took about 2 hours to arrive. He also notes that Nebraska law allows search warrants to be issued by telephonic statement, "presumably being secured in the time it takes to give an oath over the phone." Brief for appellant at 15. A review of the procedure for obtaining a telephonic search warrant set forth in Neb. Rev. Stat. § 29-814.03 (Reissue 2016), shows that doing so is somewhat more complicated, and presumably more time-consuming, than suggested by Aguilar. As a general matter, the exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022). Here, the record shows that the police department policy was for officers to not enter unsecured locations by themselves. An exception to this policy would have been if Lowery had seen someone bleeding on the floor inside the residence. McDaniel arrived approximately 10 or 15 minutes after being called by Lowery, and as noted, the warrant process took about 2 hours. The brief wait for McDaniel to arrive was reasonable in this case.

Aguilar does not challenge the scope of the exigent circumstances search of his residence, arguing instead that the police did not search enough of the residence, focusing on the fact that the officers did not fully inspect the garage where someone could have been suffering from carbon monoxide poisoning. Lowery testified that the dog inside the garage "sounded mean," but that he "[c]racked [the door] open a little bit" and did not notice anything in the garage that gave him concern for someone's wellbeing. The State suggests that this argument goes directly to the officers' intent in entering and checking the house. The State notes that an officer's subjective motivation is irrelevant in determining whether that officer's actions violate the Fourth Amendment, and under the emergency doctrine, Nebraska appellate courts do not consider

whether a search is primarily motivated by an intent to arrest and seize evidence. See *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006). See, also, *Michigan v. Fisher*, 558 U.S. 45, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (even if officer did not subjectively believe someone needed medical assistance when entering residence without warrant, test is whether there was objectively reasonable basis for believing medical assistance was needed or persons were in danger).

The district court did not err in denying the motion to suppress because the facts here, when viewed from the standpoint of an objectively reasonable police officer, establish the presence of exigent circumstances. Under the circumstances of this case, the officers were objectively justified in believing that an emergency existed. It was reasonable for the officers to believe that there may be someone inside the residence who was in need of medical assistance. In making this determination, we emphasize that the burden placed by our applicable caselaw only requires that an officer has a reasonable belief in light of the specific facts and inferences derived therefrom that an emergency exists. The officer's belief may or may not be correct. But it need only be reasonable to justify the search. *State v. Castellanos, supra*. Here, once the officers determined that there was no one inside in need of assistance or any other dangerous circumstances, such as a burglar in hiding, they left the residence and did not seize any property, including the marijuana in plain view. The officers' warrantless search of Aguilar's residence fell within the emergency exception to the Fourth Amendment prohibition against warrantless, nonconsensual searches. The trial court did not err in finding that the exception was met and denying Aguilar's motion to suppress.

*Inevitable Discovery.*

The State argues, alternatively, that even if the search was unlawful, the evidence would have been discovered by other legal means. Under the inevitable discovery doctrine, challenged evidence is admissible if the State shows by a preponderance of the evidence that the police would have obtained the disputed evidence by proper police investigation entirely independent of the illegal investigative conduct. *State v. Nunez*, 299 Neb. 340, 907 N.W.2d 913 (2018). The State argues that the officers would have secured a warrant based on the totality of the circumstances, including the unsecured front door, the full set of keys in the unlocked pickup, the way in which the pickup was parked, and the smell of marijuana outside of the house. Because we have determined that the warrantless search was lawful, we need not address this argument. See *State v. Lear*, 316 Neb. 14, 2 N.W.3d 632 (2024) (appellate court not obligated to engage in analysis not needed to adjudicate controversy before it).

CONCLUSION

The district court did not err in denying Aguilar's motion to suppress. Accordingly, we affirm.

AFFIRMED.

BISHOP, Judge, dissenting.

I respectfully disagree with the majority that under the circumstances of this case, "the officers were objectively justified in believing that an emergency existed," thus permitting a warrantless entry into Anthony Aguilar's home. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. See

- 7 -

*Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Although exigent circumstances may allow warrantless intrusions, the "contours of that or any other warrant exception permitting home entry are 'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" *Lange v. California*, 594 U.S. ___, 141 S. Ct. 2011, 2018, 210 L. Ed. 2d 486 (2021) (citation omitted). In my opinion, upholding a warrantless search into a private residence based on the circumstances alleged to be exigent in this case erodes that special protection.

The Nebraska Supreme Court has stated that "[u]nder both exigent circumstances generally and the emergency doctrine specifically," there are two principles that must be kept in mind:

(1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. . . . (2) An objective standard as to the reasonableness of the officer's belief must be applied.

. . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of seizure or the search[,] warrant a man of reasonable caution in the belief that the action taken was appropriate?

*State v. Eberly*, 271 Neb. 893, 900, 716 N.W.2d 671, 677-78 (2006) (ellipses in original, internal quotations and citation omitted).

In this case, as noted by the majority, the officers noticed the smell of marijuana outside the house, but the breeze prevented their ability to determine with certainty where the odor was coming from until they stepped inside the home. While the marijuana odor may have influenced the officers' decision to enter Aguilar's home, "an officer's subjective motivation is irrelevant in determining whether that officer's actions violate the Fourth Amendment." *Id*. at 901, 716 N.W.2d at 678. "Under the emergency doctrine, we no longer consider whether a search is primarily motivated by an intent to arrest and seize evidence." *Id*. Therefore, in determining whether the special protections afforded a home under the Fourth Amendment were violated in this instance, I have considered only the facts articulated by the officers to justify their entry into the home under the legal standard set forth above. Notably, there are some inconsistent facts between the police reports dated December 13, 2021 (the day of the search), the facts ascertainable through the officers' body-worn camera ("body cam") videos from the same day, and the facts presented through the officers' testimony at the motion to suppress hearing on January 19, 2023. I will address the discrepancies where relevant below.

It is important to bear in mind that the initial call to law enforcement about Aguilar's truck did not come from a neighbor concerned about his welfare; rather, it was a "garbage truck making the rounds" that "called in a complaint of a vehicle in the street blocking its way." Neither the complaining person nor the truck's status itself indicated exigent circumstances. According to the officers, the ordinary remedy would have been to tow the truck. Both Officer John Lowery and Sergeant John McDaniel acknowledged that ordinarily when a vehicle is obstructing a roadway, they tow the vehicle. Officer Lowery even agreed that in his 23 years "on the force," when they

came upon a vehicle that had keys in the ignition and the vehicle was not secure, they "try to locate the owner" and if unable to do so, they would tow the vehicle. Also, according to Sergeant McDaniel's testimony, when Officer Lowery told him about the truck, the keys, and that no one answered when he initially rang the doorbell several times and knocked on the door to the home, the sergeant told him "to continue trying to make contact with the registered owner, and if [Lowery] was not able to, we would end up having to tow the truck."

There is no evidence in the record as to whether Officer Lowery obtained Aguilar's telephone number when he ran the plate on the truck, and if so, whether he attempted to call Aguilar. However, dispatch had confirmed that Aguilar was the owner of the residence. Therefore, at this point, Officer Lowery knew the truck and the house belonged to Aguilar. There was no objectively rational basis to believe an emergency situation existed because of a poorly parked truck with the keys left in the ignition. The ordinary remedy in such circumstances, as acknowledged by the officers, was to have the truck towed if they could not reach the owner. When asked on cross-examination why he did not just tow the vehicle, Officer Lowery responded, "Because in the process of trying to find that owner, other things came up about the house, the whole totality of the situation with everything that was going on." Notably, there was never an explanation for what "process" was used to try to locate the owner since it had already been determined that no one was responding to the doorbell and knocking. And the only "other thing" that "came up about the house" at that juncture was the marijuana odor outside the house.

However, rather than simply arranging for the truck to be towed, Officer Lowery went back up to the house, which he estimated was 15 or 20 minutes after the first time he knocked on the door. He testified that he knocked on the storm door again, rang the doorbell, then opened the storm door to "bang on the other door and it opened." This was odd to him since "[n]obody was answering, [he] figured the house would be secured." On cross-examination, when Officer Lowery was asked if the door "got pushed open because of [his] knocking," he responded, "I guess, yeah."

I note here that the district court's order denying Aguilar's motion to suppress indicates that when Officer Lowery "opened the screen door to knock on the main door," he "noticed that it was slightly ajar." This is not consistent with the officer's testimony that he banged on the door "and it opened." However, it is consistent with Officer Lowery's police report that when he "opened the screen door to knock on the main door," he "noticed the door was slightly ajar." Sergeant McDaniel's police report also indicates that Officer Lowery informed him that when he went back to the residence and opened the storm door to knock on the front door, "he noticed the front door was slightly ajar." However, the video from Officer Lowery's body cam, which he turned on only after he had opened the storm door in his second trip to the front door, showed that the front door was not yet ajar. Further, in Officer Lowery's report, after indicating the door was "slightly ajar," he stated, "Due to the position of Aguilar's truck for such a long period of time, unlocked with keys in the ignition, and the unsecured front door with no answer," he was "concerned someone may be hurt or in need of assistance, or someone may have broken into the house." There was no mention of shoes or an open kitchen drawer in the report.

In denying the motion to suppress, the district court's apparent reliance upon the inaccurate description contained in the written police reports resulted in an erroneous factual finding that the door was already "ajar." During Officer Lowery's testimony, he acknowledged that it was his knocking that caused the front door to open; he no longer claimed the door was already ajar upon

opening the storm door. Officer Lowery's testimony is consistent with his body cam video. In other words, there was no "ajar" or "open" door until Officer Lowery caused it to be such, and this fact was not accurately communicated to Sergeant McDaniel, who made the decision to enter the home without a warrant in part based upon Officer Lowery's representations to him.

Officer Lowery testified that he then called for backup, indicating that he had an "open door." Again, he did not report that the door only became "open" because of his repeated knocking. Nevertheless, at that point, he thought "[s]omething was wrong" because "the house was unsecured," the truck was "in the middle of the road, the keys, and nobody was answering." He also testified that when he looked through a window, the house "looked a little sparsely furnished, as if somebody had maybe just moved in or [was] moving out," and he saw "what appeared to be adult work boots and some children's shoes at the base of the stairs, leading upstairs." And when he had walked around the house earlier, "checking on it, [he] could see through the windows into the kitchen" and "[o]ne of the kitchen drawers was hanging wide open." According to Officer Lowery, "[I]t just didn't seem right," and his primary concern when making the decision to enter the house was that "there was somebody hurt inside the home."

Sergeant McDaniel testified that Officer Lowery requested an additional unit because "he had an open door at the residence," and "based on the totality of the circumstances, the information that [Lowery] had provided to [him] and that [he] had observed [himself], [he] felt that there [were] exigent circumstances under the emergency aid doctrine of the Fourth Amendment," and that "there possibly could be somebody injured inside the residence and/or somebody could have had a medical emergency." In his police report, dated the same day as the search, Sergeant McDaniel indicated, "Given the information that I had received from Ofc. Lowery, the truck with keys in the ignition blocking the roadway for 24 or more hours according to a neighbor, no answer at that door, several dogs barking within the residence, and an open front door, led us to believe that someone could be injured, or had suffered some sort of medical emergency." The report further noted that they had "smelled the odor of raw marijuana while walking around the outside of the residence, but were unable to pinpoint its origin due to wind and being outside." The sergeant informed dispatch they would be entering the home, and he gave "loud verbal announcements" indicating they were police, which he also announced in Spanish. Once inside, he could smell the odor of raw marijuana.

The sergeant's report further indicated that Aguilar had shown up while they were waiting for a search warrant. Aguilar had been dropped off nearby and approached on foot carrying a vehicle battery. Aguilar indicated his truck "had broke down" and that the battery was for the truck. The sergeant told Aguilar that "none of this would have occurred if [Aguilar] hadn't left his truck blocking the roadway with the keys in the ignition, and his front door being partially open." The vehicle was subsequently towed.

My concerns about this warrantless search should not be construed to suggest any improper motivations by law enforcement; their subjective consideration of the circumstances may have caused them to believe entry into the home was immediately necessary. However, as previously indicated, an officer's subjective motivation, whether proper or improper, is irrelevant in determining whether there was a Fourth Amendment violation under the emergency doctrine. Rather, when assessing whether the facts "reasonably warrant that intrusion. . . . it is imperative that the facts be judged against an objective standard." *State v. Eberly*, 271 Neb. 893, 900, 716

N.W.2d 671, 677 (2006). When judging these facts against an objective standard, I conclude that a person of reasonable caution would not have believed that immediate entry into the home was necessary for the preservation of life or property, as discussed next.

First of all, both officers acknowledged that the truck, with its keys, obstructing the roadway, would ordinarily result in the vehicle being towed. Yet that did not happen until after Aguilar arrived with a vehicle battery. Officer Lowery had already determined no one was responding to the doorbell or the knocking. The front door and the storm door were closed at that time. And if the officer was otherwise unable to reach Aguilar, the ordinary practice was to call a tow truck. Instead, Officer Lowery returned to the house a second time, opened the storm door, rang the doorbell, and repeatedly knocked, causing the front door to become ajar. According to Officer Lowery's police report, he was dispatched to the home at "1210 hours," or just after noon. An unlocked or unlatched front door (with a latched storm door) and no response to a doorbell and knocking at that time of day could mean any number of things that do not involve an emergency situation. It is not uncommon for a front door to be fully open or otherwise unsecured during daytime hours when a storm door otherwise provides a barrier to entry. A person of reasonable caution would not immediately conclude that an unlocked, unlatched, or even fully open door (behind a storm door) means that an emergency situation exists in the home simply because no one responds to a doorbell and knocking. Other more compelling factors need to be present to constitute exigent circumstances, such as, for example, those in *State v. Eberly, supra*. In that case, a burglary was reported at a residence, a neighbor heard a loud bang, two men were seen fleeing the home carrying a bag, and the back door of the home had been forced open and damaged. It was not known whether any suspects or victims remained in the home, and no one responded to law enforcement's knock on the door. The Nebraska Supreme Court concluded the emergency doctrine justified the officers' warrantless entry under those circumstances.

The circumstances present in this case are quite different from those in *Eberly*. Here, there is the truck that could have been towed, and an "open door" that the evidence demonstrates was not "ajar" or "open" until knocked upon repeatedly. Further, the remaining facts offered in support of the officers' warrantless entry into the home do not justify this search, even when considered in "totality." None of the remaining facts or any rational inferences derived from those facts makes more reasonable the belief that an emergency situation required immediate entry into the home.

For example, the officers testified at the motion to suppress hearing that open cabinets and drawers in the kitchen and shoes at the foot of the stairs contributed to their decision to enter the home. However, the officers' written reports drafted the day of the search do not mention anything about cabinets, drawers, or shoes; nor did the reports connect such items to a possible burglary situation. However, on direct examination by the State, Officer Lowery indicated that he considered burglary a possibility because of an open drawer in the kitchen, the shoes, and the "door being a little unlatched." Sergeant McDaniel testified that Officer Lowery had told him that "when [Lowery] had walked the perimeter of the residence, he had seen in the kitchen some open drawers, I think cupboards, things that looked out of sorts." And then upon arriving, Sergeant McDaniel said he "also observed those open cabinets, drawers at the back of the house." However, when the sergeant was cross-examined about his reference to multiple open drawers and cupboards in light of Officer Lowery's testimony that only one drawer was open in the kitchen, the sergeant responded that the "case was over a year ago and based upon my written report, I don't remember

if it was one drawer, one cupboard. I just remember that -- that [Lowery] brought that to my attention upon arrival and that I also looked through the residence window . . . and had seen what he was talking about." The sergeant testified that he would defer to Officer Lowery's testimony about one drawer because he was the one who made him "aware of it."

The lack of any reference to cabinets and drawers in the officers' written reports and the inconsistent testimony at the suppression hearing suggests that the sergeant may have been under the impression that there were multiple cupboard doors and drawers open in the kitchen based upon what Officer Lowery had communicated to him at the time. However, the body cam video received into evidence shows only one drawer open in the kitchen, as testified to by Officer Lowery. It cannot rationally be inferred that one open drawer in a kitchen indicates a burglary or some other emergency, even when considered with the other evidence.

As for the shoes at the foot of the stairwell leading to the second floor of the house, it is not clear why the officers believed that shoes in disarray at the foot of a stairwell was somehow indicative of a burglary or other emergency in the home. Neither officer provided a sound explanation as to why the shoes factored into their thinking. During cross-examination, when Officer Lowery was asked to detail the "totality of the situation," he referenced the shoes he saw at the base of the stairs, "like somebody may be in there and just kicked their shoes off before they went upstairs, and then the door was unsecured." Sergeant McDaniel testified that from the front door, he noticed "at the base of the stairs that go upstairs," that there were "shoes that appeared to be knocked over in front of the stairwell." When he was asked why shoes at the bottom of the stairs seemed suspicious, the sergeant responded, "It just . . . seemed odd to me, the placement of the shoes. I mean, they weren't neat and orderly as if somebody was in the residence." The reference by both officers to the shoes at the foot of the stairwell was never fully developed into a coherent explanation as to the nexus between the shoes and the need to immediately enter the home, even when considering the other facts upon which the officers relied.

Finally, the dogs barking inside the home was mentioned without further explanation in Sergeant McDaniel's list of factors that led him to think an emergency situation existed. However, dogs barking inside a home or garage is not unusual, particularly upon the repeated ringing of the doorbell and knocking on the front door. Notably, the record does not reveal that any neighbor reported a concern or complaint about unusually excessive barking coming from the residence.

I am also not persuaded by the State's alternative argument that even if the search was unlawful, the evidence would have been discovered by other legal means under the inevitable discovery doctrine. The only evidence of unlawful activity to support a search warrant was the smell of marijuana in the air. However, neither officer could pinpoint where the smell was coming from until they entered the home. It is highly unlikely that a search warrant would have been issued under such circumstances.

In summary, I conclude that the district court clearly erred in its factual finding that the front door was already "ajar" when Officer Lowery returned to the house the second time. Any reliance on an "ajar" or "open" door to support a warrantless entry under the emergency doctrine was misplaced. Further, in my de novo review of the district court's determination that exigent circumstances existed, I disagree that such circumstances existed for the reasons discussed above. I would reverse the judgment of the district court and remand the cause with directions to sustain the motion to suppress.